## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN J. MURPHY, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| | : | **NO. 11-4743** |
| RADNOR TOWNSHIP, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OPINION

**Tucker, J.**                                                          **November ___, 2012**

Presently before the Court is Defendant's Motion for Summary Judgment (Docs. 13 & 15) and Plaintiff's Response in Opposition thereto (Doc. 14). Upon consideration of the parties' motions with briefs and exhibits, and for the reasons set forth below, Defendant's Motion will be *granted*.

## I.  FACTUAL BACKGROUND[1]

Plaintiff John J. Murphy ("Murphy") brings this action against Defendant Radnor Township ("Radnor" or the "Township") for alleged violations of the Uniform Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. § 4301 *et seq.*, and the Pennsylvania Military Affairs Act ("PMAA"), 51 Pa. Cons. Stat. § 7301 *et seq.* Murphy alleges the Township impermissibly discriminated against him on account of his military and/or reserve obligations, and thereby failed to hire him for the position of Township Manager. Plaintiff

---

[1] Pursuant to a Court Order (Doc. 17), the parties were asked to submit statements of undisputed and disputed facts. Defendant submitted its statement (Doc. 18), to which Plaintiff enumerated his responses (Doc. 19). Unless otherwise noted, the following is a recitation of those facts, as stated by the Defendant, which Plaintiff has agreed are undisputed.

requests the Court: (1) declare the practices of the Defendant to be violative of the USERRA and PMAA; (2) order Defendant to render back pay, front pay, and compensatory damages; and (3) instate Plaintiff to the position of Township Manager or to a position of similar responsibilities and pay.[2]

Plaintiff Murphy entered the Air Force in 1997 and served on full-time active duty until September 2002.  From September 2002 to present, he has served in the active reserves, currently holding the rank of major.  Murphy was Deputy Administrator for the City of Wilkes-Barre from July 2002 to January 2004, and City Administrator from January 2004 to March 2010.  During his employment with City of Wilkes-Barre, Murphy was deployed as part of his duty in the active reserves.  From March 2008 to October 2008, Murphy was stationed in Djibouti, Africa, where he was Director of the Personnel Recovery Center, Combined Task Force.  In this position, Murphy coordinated search and rescue operations in fourteen countries. Murphy also served as Watch Supervisor, Air Rescue Coordination Center, at Tyndall Air Force Base in Virginia.  In March 2010, Murphy left municipal government to start his own consulting firm.

In June 2009, Murphy applied for the position of Township Manager for the Defendant. At that time, John Granger ("Granger") was serving as Interim Township Manager.[3]  Granger recommended to the Board of Commissioners (the "Board") that Radnor hire a private, third party consultant to assist in hiring a new township manager.  As a result, Dan Olpere ("Olpere"), owner of Local Government Management Services, LLC, was retained by the Radnor Township Board of Commissioners to gather resumes for the township manager position.  Olpere collected,

---

[2] Plaintiff has withdrawn his claim for punitive damages. (Pl.'s Br. Opp'n Summ. J. 7.)

[3] Granger was the Interim Township Manager in Radnor Township from April of 2009 to December of 2009. (Granger Dep. at 6.)

read, and ranked resumes, sending a more detailed application to those he ranked "must interview" and "could interview."  Olpere also vetted the applications, and provided a listing and comments, regarding each of the candidates.  As a result of his work, Olpere created three binders ranking the candidates.  The Board of Commissioners then met to decide whom they wanted to interview for the position.  Of the six candidates in the first tier marked "must interview" by Olpere, the Board selected three candidates for interviews, including Robert Zienkowski ("Zienkowski") and David Kraynik ("Kraynik").  Of the five second tier of candidates, marked "could interview," the Board selected another three candidates for interviews: Peter Miller ("Miller'), Christopher Canavan ("Canavan"), and Plaintiff Murphy. Granger scheduled these interviews, having received the list of interviewees from the Board.

Granger called Murphy on July 16, 2009 to schedule his interview.  According to Murphy, Granger expressed the following:

> [Granger] was very positive.  [He] [t]old me I was one of eight finalists selected for an interview.  That he was extremely impressed with my military background and my experience in Wilkes-Barre, and that was exactly what Radnor needed, in terms of the ethical leadership in response to community outrage over [former Township Manager] David Bashore's actions.[4]

(Murphy Dep. at 31.)  On June 27, 2009, while the vetting process was still going on, Commissioner Thomas Masterson (who was also President of the Board of Commissioners) received a call from Congressman Patrick Murphy. Congressman Murphy is Plaintiff Murphy's brother. Congressman Murphy left a voicemail for Commissioner Masterson stating, "I'm calling on behalf of my brother's application for township manager with Radnor.  Please call me."  This call was not returned by Commissioner Masterson, and it appears all or most of the other Commissioners and Granger did not know about the phone call until after the Plaintiff's

---

[4] As will be discussed, Granger denies this conversation ever took place.

interview.

Murphy's interview was held on July 22, 2009.  The interview lasted approximately forty-five minutes and was attended by Interim Manager Granger and Commissioners Masterson, John Fisher ("Fisher"), Enrique Hervada ("Hervada"), and Hank Mahoney ("Mahoney"). Murphy's military experience and reserve obligations were discussed for at least ten minutes of his forty-five minute interview with the Board.  Masterson, as President, led the questioning of all the candidates, including Murphy.  Murphy characterizes the interaction as being "grilled" by Masterson.  Murphy mentioned that his reserve obligations would require him to be gone approximately thirty-five days per year.  Murphy states that Masterson questioned him on how his municipality could deal with his military commitments or even afford to deal with having the manager gone for that length of time.

At some point during this line of questioning, Granger became concerned that the Board was focusing too heavily on Murphy's military commitments.  Granger testified that he essentially told the Board to "shut up," after which point the Board's tone changed to asking more about Plaintiff's actual duties in the military, rather than the amount of time he spent performing them.  Murphy, sensing that the interview was "going south," informed the Board that he would be willing to move to inactive reserves to secure the position of township manager.

Ultimately, on July 27, 2009, Granger returned a message left for him by Murphy regarding the results of his interview.  According to Murphy, Granger informed him that he was one of the top four candidates for the position, but the Board was only going to invite three candidates back for a second interview.  Further, Murphy alleges that Granger specifically informed him that "[he] was right there in the top four, but that the commissioners had serious

reservations about [his] ongoing military obligation.[5]

Candidates Miller and Kraynik were offered second interviews, after which Miller was extended a job offer.  After Miller turned down the job, Kraynik was offered the position. Kraynik also rejected the job.  After Miller and Kraynik rejected the Township's job offers, the Board then decided to give a second interview to Candidate Canavan, who was initially rejected for a second interview.  After being offered the position, Canavan also rejected the job offer.  At this point Candidate Zienkowski, who for personal reasons had previously withdrawn his name from consideration after his first interview, then let it be known that he was now interested in the job. Zienkowski was given a second interview, after which he was offered the job and accepted it.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ P. 56(c); <u>see</u> <u>also</u> <u>Levy v. Sterling Holding Co., LLC</u>, 544 F.3d 493, 501 (3d Cir. 2008).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Dee v. Borough of Dunmore</u>, 549 F.3d 225, 229 (3d Cir. 2008).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. <u>See</u> <u>Anderson</u>, 477 U.S. at 248; <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its

---

[5] As will be discussed, Granger denies this conversation ever took place.

burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986).  Once the moving party has

carried its burden under Rule 56, "its' opponent must do more than simply show that there is

some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine

issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Martin

v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial. See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247,

253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light

most favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount

Communications, Inc., 258 F.3d 132 (3d Cir. 2001).  The court must award summary judgment

on all claims unless the non-moving party shows through affidavits or admissible evidence that

an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579

(D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J.

2002).

## III.  DISCUSSION

Radnor Township asserts that it is entitled to summary judgment, pursuant to Fed. R. Civ.

P. 56, because no genuine issue as to a material fact exists as to whether it would have hired

Murphy even without the alleged improper consideration of Murphy's military service and

commitments.  The Court agrees with the Defendant.

### A.  Uniformed Services Employment and Reemployment Rights Act (Count I)

The Uniformed Services Employment and Reemployment Rights Act ("USERRA") provides, in relevant part, as follows:

> A person who is a member of ... or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership…or obligation.

38 U.S.C. § 4311(a).  It elaborates further: "An employer shall be considered to have engaged in actions prohibited ... under subsection (a), if the person's membership ... is *a* motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership." Id. at § 4311(c) (emphasis).  Thus the statute, by its terms, prohibits discriminatory actions where a person's military status is simply *a* motivating factor, not *the* sole motivating factor.

An employee (or, in this case, potential employee) making a USERRA discrimination claim shoulders "the initial burden of showing by a preponderance of the evidence that the employee's military service was 'a substantial or motivating factor' in the adverse employment action." Sheehan v. Department of the Navy, 240 F.3d 1009, 1013 (Fed.Cir.2001) (quoting National Labor Relations Bd. v. Transportation Management Corp., 462 U.S. 393, 400-01 (1983) abrogated by Director, Office of Workers' Compensation v. Greenwich Collieries, 512 U.S. 267 (1994) (on other grounds)).  "If this requirement is met, the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." Sheehan, 240 F.3d at 1013. "The factual question of discriminatory motivation or intent may be proven by either direct or circumstantial evidence." Id. at 1014 (citations omitted).  Under USERRA, discriminatory motive may be reasonably inferred from a variety of circumstantial factors (as discrimination is rarely open or notorious), including:

7

proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses. Id. In order to determine whether "the employee has proven that his protected status was

part of the motivation for the agency's conduct, all record evidence may be considered," including the employer's explanation for the actions taken. Id. Once the employee has met this burden, "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." Id.

1. Plaintiff Has Met His Burden of Proving that his Military Obligations Were a Motivating Factor in Defendant's Decision Not to Grant Him a Second Interview and/or Hire Him

Radnor Township first argues that Murphy has produced no direct evidence of discrimination, and therefore this case is properly analyzed pursuant to the burden-shifting framework articulated by the Supreme Court McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The Court disagrees with the Township on both accounts.

The Supreme Court has stated that USERRA is "very similar to Title VII," which of course "prohibits employment discrimination 'because of ... race, color, religion, sex, or national origin' and states that such discrimination is established when one of those factors 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'" Staub v. Proctor Hosp., 131 S. Ct. 1186, 1191 (2011) (citing 42 U.S.C. §§ 2000e–2(a), (m)). However, analysis of USERRA claims is a two-pronged burden shifting analysis. Hart v. Hillside Twp., CIV.A. 03-5841, 2006 WL 756000 (D.N.J. Mar. 17, 2006) aff'd sub nom. Hart v. Twp. of Hillside, 228 F. App'x 159 (3d Cir. 2007). This is markedly different from the three-pronged McDonnell Douglas burden shifting analysis used in Title VII cases,

where the burden of persuasion always remains with the employee. McDonnell Douglas, 411

U.S. at 802.  Accordingly, if Murphy is able to produce either direct or circumstantial evidence

that his military obligations were a motivating factor in the Township's decision not to grant him

a second interview and/or hire him, the burden of persuasion then shifts to the Township to

prove it had legitimate, nondiscriminatory reasons for making its decision.

    The Court finds that there are two possible instances that give rise to direct evidence of

the Township discriminating against Murphy based on his military status. These are: (1)

Granger's alleged comments to Murphy when he informed Murphy that he would not be

receiving a second interview, and (2) the Board's line of questioning during Murphy's interview.

As to the first instance, it must be noted that Granger has denied that he ever told Murphy that

the Board's concern about his "ongoing military commitments" was the reason he was not

receiving a second interview. (Granger Dep. at 68.)  Further, Commissioner Masterson has

testified that Granger was not authorized to speak on behalf of the Board as to the reasons

candidates were not given a second interview. (Masterson Dep. at 104.)  Commissioner Fisher

also noted that he does not recall any members of the Board asking Murphy how many days a

year he would be away performing his reserve duties, but does recall Murphy volunteering that

information himself. (Fisher Dep. at 51-52.)  Fisher also states he was not concerned that

Murphy could potentially be away performing reserve duties for thirty-five days a year, because

a township manager gets four to six weeks of vacation a year, such that the military obligations

could be easily accommodated. (Id. at 52.)[6]  Similarly, Commissioner Mahoney recalled

---

[6] Fisher also believed that Murphy's military background was generally a positive: "If a Township Manager left our Township to serve our country for 35 days a year, I saw that as a major positive, because that would just – that would be – that would be for better in terms of conveying trust to the electorate than anything anyone could ever say. There is no better way to say it than to do it and to me that was a huge positive." (Fisher Dep. at 55.) Commissioners Masterson and Mahoney agreed. (Id. at 55-56.)

Murphy's reserve obligations coming up during his interview, but that it was something that "wasn't a big deal," given that the Township has accommodated military obligations for numerous police officers in the Township. (Mahoney Dep. at 45, 47.) Mahoney also pointed out that the Township could always have the Assistant Manager step in if needed during the Township Manager's absence. (Id. at 49.)

Thus, there is genuine issue of material fact as to whether Granger made this comment to Murphy and, if so, whether such comment would have even been accurate. Given that only Murphy and Granger were privy to this alleged conversation, it is clearly Murphy's word against Granger's. For purposes of resolving this summary judgment motion the Court must construe the facts and inferences in the light most favorable to Murphy as the non-moving party. The Court therefore assumes that Granger made this comment.

Further, as to the second instance, Granger has not denied that, during Murphy's interview, he was "concerned" and "uncomfortable" with the extent of the questions concerning Murphy's military commitments. (Murphy Dep. at 45.) Granger has testified that he believed the Commissioners had enough information about Murphy's military commitments, and he wanted to advise the board that certain questions could be inappropriate. (Id. at 47.) Granger was unsure of whether the Commissioners had already gone over the line to improper questioning. (Id. at 48.) Granger wanted that line of questioning to stop before they possibly broke the law, and he did not know if they had already broken the law by their questioning. (Id. at 50.)[7] Granger further testified that the gist of what he told the board was "[s]hut up." (Id. at

---

[7] Specifically, Granger stated: "I know that there's a line in the sand regarding what questions and types of questions that an employer can ask an employee regarding military service. I don't know where that line is. As a conservative manager, I felt it my duty to alert the board of the fact that they need to be cautious about the questions, they types of questions they ask regarding military service." (Granger Dep. at 45-46.) Granger further testified that he was concerned about the "length at which this part of Mr. Murphy's service…was taking precedent in the interview." (Id. at 46.)

49.)  Granger has stated that, after his interjection, the Board's tone changed to asking more about Murphy's actual duties in the military, rather than the amount of time he spent performing them. (Id. at 52.)

Accordingly, the Court finds Murphy has adduced sufficient direct evidence that his military commitments were a substantial or motivating factor in the Township declining to give him a second interview.

2.  Defendant Has Met Its Burden of Proving that it Had Legitimate Reasons for Not Granting Plaintiff a Second Interview and/or Hiring Him

Murphy having met his initial burden, the burden now shifts to the Township to show that it would have declined to grant Murphy a second interview and/or hire him for legitimate, non-discriminatory reasons.  The Township has presented four reasons why Murphy was not granted a second interview and would not ultimately have been hired: (1) Murphy was not qualified for the position of Township Manager, and there were at least four, actually qualified candidates for the position; (2) Murphy "embellished his qualifications to the point of falsity," particularly with respect to his suggestion that had formulated a financial recovery plan for Wilkes-Barre; (3) Murphy's application materials were "error riddled"; and (4) Murphy had improperly inserted his brother, a United States Congressman, into the vetting process. (Def.'s Mem. in Supp. Mot. Summ. J. 17.)

Before individually examining each of these stated reasons, the Court first must address Murphy's contention that the Court cannot rely on the testimony of the Township's deposed witnesses in resolving this motion for summary judgment.  In his response to the Township's statement of disputed and undisputed facts (Doc. 19), Murphy repeatedly cites Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000) for the proposition that the

Township's summary judgment motion cannot be based upon the testimony of interested witnesses or any evidence the jury is not required to believe, even if the evidence is uncontradicted and unimpeached.  The Court, of course, must follow the Supreme Court's holding.  However <u>Reeves</u> does not, as Murphy suggests, require that the Court disregard the testimony of the commissioners simply because they are interested witnesses.  The Third Circuit, in interpreting <u>Reeves</u>, has explained: "[t]he fact is that in considering a motion for summary judgment the court should believe uncontradicted testimony *unless it is inherently implausible* even if the testimony is that of an interested witness." <u>Lauren W. v. DeFlaminis</u>, 480 F.3d 259, 272 (3d Cir. 2007) (emphasis added); <u>see</u> <u>also</u> <u>Sandstad v. CB Richard Ellis, Inc.</u>, 309 F.3d 893, 898 (5th Cir. 2002) (definition of interested witness cannot be so broad to require rejection of company's agents' testimony regarding reasons for discharging employee; "to so hold would foreclose the possibility of summary judgment for employers, who almost invariably must rely on testimony of their agents to explain why the disputed action was taken"); <u>Phinizy v. Pharmacare</u>, 569 F. Supp. 2d 512, 518 (W.D. Pa. 2008).  Thus, in considering the testimony of the commissioners, which Murphy obviously disputes, the Court is not making impermissible credibility determinations about these witnesses.  Rather, the Court is examining whether their testimony is inherently implausible in light of the record or, conversely, substantiated by the record.

**<u>Qualifications</u>**

Defendant first moves for summary judgment on the ground that Murphy was not qualified for the position of Township Manager, and there were at least four candidates (Miller, Kraynik, Canavan, and Zienkowski) who were actually qualified for the position.  In his Complaint, Plaintiff claims that he "was as qualified or more qualified for the position of

Township Manager than the… remaining applicants [who] were granted interviews." (Compl. at

¶ 32.)  However, Murphy later conceded in his deposition that he did not, in fact, know the

backgrounds of any of the other candidates who were interviewed for the position. (Murphy Dep.

at 45.)  Indeed, Murphy did not learn who got a second interview until the discovery process.

Murphy now contends:

> Due to the wide variations in each candidate's background and work experience, such
> determination is a question of fact which can only be determined by the fact finder at
> trial.  Additionally, viewing the evidence in the light most favorable to Mr. Murphy, as
> mandated at this stage, prevents this Court reaching the conclusion that the other
> candidates offered the job were better qualified.

(Pl.'s Br. Opp'n Summ. J. 15.) Notably, however, Murphy offers little evidence and no

citation to legal authority to support this contention.  Conversely, the Court of Appeals for the

Third Circuit has held:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's
> proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the
> employer's proffered non-discriminatory reasons…was either a *post hoc* fabrication or
> otherwise did not actually motivate the employment action (that is, the proffered reason
> is a pretext).

> Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (Title VII case; emphasis in original).

"To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the

employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent." Id. at 765 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d

509, 533 (3d Cir.1992), cert. denied, 510 U.S. 826 (1993).  Rather, "the non-moving plaintiff

must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder *could* rationally find them unworthy of credence, and hence infer that the employer

did not act for [the asserted] non-discriminatory reasons." Id. (internal citations omitted; emphasis in original).

      Murphy's blanket, unsupported assertion that he was "more qualified" than the candidates who were granted second interviews fails to satisfy this burden.  The Township, conversely, argues that Murphy had insufficient experience in a municipal manager position as compared to the individuals brought back for a second interview.  The candidate summaries prepared by Olpere, which aided the Board of Commissioners in choosing the first round of interviewees, fully substantiate the Township's argument. (Def.'s Ex. M: Local Government Management Services' Summaries of Candidates.)  The following is a side-by-side comparison of Olpere's executive summaries:

| Candidate | Plaintiff Murphy | Peter Miller (first offer) | David Kraynik (second offer) | Christoper Canavan (third offer) | Robert Zienkowski (fourth offer; accepted) |
|---|---|---|---|---|---|
| Qualifications | Has made great strides in turning around an economically depressed community. Touts military experience. Less than 10 yrs in municipal govt. Straight-forward style. | Mun[icipal] Adm[inistrator] (Egg Harbor, NJ) 20 yrs. 40,000 pop.<br><br>Mun[icipal] Mgr (Phillipsburg, NJ) 5 yrs<br><br>Dep[uty] Adm[inistrator] (Leonia, NJ) 5 | Has worked 28 years in one community and has managed a large staff.<br><br>Good experience in operations. Is competent and straight-forward. Has | Dir of Land Acquisition; Proj Mgr for land approvals (private developer)<br><br>Adj[unct] Instructor in public adm[inistration] (Villanova Univ) | Current salary $103,000+.<br><br>Manages a medium size city (36,000) in Ohio with 250 employees.<br><br>Claims excellent leadership skills. |

| | Values integrity. Current combined salary (with military) is $150,000 | yrs  Bldg Services Coor[dinator] (Maple Shade, NJ) 2 yrs. | impressive list of professional organizations to which he belongs.  Current salary $142,886.  Seeking $168,000. | Twp Mgr (Towamencin Twp) 1yr.  Exec Dir of Infrastructure Auth (Towamencin)  Exec Dir of twp Authority (Towamencin)  Twp Mgr (Upper Prov Twp, DelCo) 3yrs  Acting Twp Mgr; Asst Twp Mgr (Lower Gwynedd Twp) 3 yrs.  Member of Lower Salford Twp (sewer) Authority | Appears to be well versed in operations, economic development and strategic planning.  Involved in many professional and service organizations.  Has received numerous civic awards and recognitions. |
|---|---|---|---|---|---|

Id.  As Murphy's summary states, Murphy had less than the ten years of experience that was recommended in the job announcement.  Murphy counters that "all those who received a second interview had no military experience, and did not have ongoing military obligation." (Pl.'s Br. Opp'n Summ. J. 12.)  While this is true, it is also true that all those who received a second interview had far more experience in municipal government than Murphy.  Miller's resume demonstrates that he had thirty-two years of experience in municipal government, with increasing responsibility over a long time span.  In addition, Zienkowski's summary goes on to list progressive responsibilities over a more than fifteen year career in township management.

Murphy takes particular issue with Canavan having been offered the position.  Canavan,

at the time he interviewed, was a Professor of Public Administration at Villanova University.

Prior to that, Canavan had "merely" four years' experience as a township manager, which ended

in 2003, and approximately two and a half years' experience as assistant township manager

ending in 1999. (Pl.'s Br. Opp'n Summ. J. 6.) Murphy neglects to note, however, that this was

six and a half more years of experience in a township whose governing structure (that of a Board

of Commissioners) was comparable to Radnor Township.  Murphy, on the other hand, had a

similar amount of experience in Wilkes-Barre, but that city has a strong mayoral system.

Further, Villanova is also located in Radnor Township, which gave Canavan the advantage of

being seen as a "local" candidate.  Canavan also came highly recommended to Commissioner

Mahoney by Larry Comunale, the township manager of Lower Gwynedd, for whom Canavan

had worked. (Mahoney Dep. at 105-107.)  Based on the foregoing, the mere fact that those

candidates who received a second interview did not have ongoing military obligations does not

give rise to an inference of discriminatory intent.

  As Murphy suggests, it is not the place of this Court to determine whether or not Murphy

was qualified for the position of township manager.  However, it is also not the place of this

Court to question the Township's determination that the other four candidates were more

qualified that Murphy, and therefore deserving of second interviews, unless that determination

was so clearly outlandish that it cannot possibly have been the Township's true reason.  See

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (citing Carson v.

Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir.1996) ("[F]ederal courts are not arbitral boards

ruling on the strength of 'cause' for [the adverse employment action]. The question is not

whether the employer made the best, or even a sound, business decision; it is whether the real

reason is [discrimination].")  Radnor Township has pointed to substantial evidence in the record

from which no reasonable jury could fail to find that the four candidates offered second interviews (and ultimately the position) possessed certain qualifications that Murphy did not. The Court therefore finds Radnor Township's assertion that these other candidates were more qualified that Murphy to be reasonable.

**Financial Recovery Plan**

If there is any single factor that played the largest role in Murphy not getting a second interview, it is likely the perception — almost universal amongst the commissioners — that Murphy had embellished his qualifications for the position of township manager.  In particular, nearly all of the commissioners testified that Murphy exaggerated his role in formulating a financial recovery plan for Wilkes-Barre.  As previously mentioned, Olpere sent a more detailed application to those he ranked "must interview" and "could interview." (Olpere Dep. at 16-17; Def.'s Ex. J: Murphy's Detailed Application.) Murphy, who was marked as "could interview," accordingly completed one of these detailed application.  Murphy's application clearly and emphatically states that he "[s]killfully maneuvered municipality through financial recovery." (Def.'s Ex. J at 5.)  Plaintiff went on to elaborate his "*[c]reation* of a five-year recovery plan, which led the city from the brink of bankruptcy without a bond rating to being the 3rd highest rated ("AA") city in the Commonwealth of Pennsylvania with a financial turnaround of more than $50M, as well as savings of $1.5M over four years through offering retirement incentive." Id. (emphasis added).  Murphy's application goes on to give further details regarding his financial experience.

It cannot be disputed that Murphy's use of the word "creation" clearly implied that he was directly and causally responsible for the production and development of this financial recovery plan.  In reality, however, Murphy did not create Wilkes-Barre's financial recovery

plan.  Rather, he hired an outside consulting firm, PFM, which in turn created the plan.  During

his deposition, Murphy conceded that PFM created the plan. By comparison, Murphy stated that

he, along with Wilkes-Barre's mayor and finance officer, "gave input" to PFM. (Murphy Dep. at

25.)  Murphy and other city officials then "implemented" the plan they were given by PFM. Id.

There can be little doubt that "implemented" is both connotatively and qualitatively

different from Murphy's earlier claim that he "created" the financial recovery plan.  The

commissioners, during Murphy's interview, could not help but pick up on this fact.  Masterson

believed that Murphy's choice of words was "an intentional representation" on his part; that is,

Murphy "intended for the reader to infer that he was the architect, that he was the spearhead for

the municipality to get through this financial recovery when, in fact, during the interview, we

learned that it was not …his project that he spearheaded." (Masterson Dep. at 113-114.)

Similarly, Commissioner Mahoney testified that Murphy had "exaggerated" his role in Wilkes-

Barre's financial recovery, and took credit for PFM's five year plan. (Mahoney Dep. at 72, 101.)

Mahoney also found Plaintiff's claim that he "skillfully maneuvered the municipality through

financial recovery" to be false. (Id. at 75.)  Mahoney further testified that Murphy's assertions

about "creating" the financial recovery plan played a vital role in Murphy getting an interview in

the first place.  The commissioners, in granting Murphy an initial interview, thought they were

"getting this person who was a wiz at finance, who brought [Wilkes-Barre] back from the brink.

Id. at 73. Ultimately, however, the commissioners "didn't feel that the facts bore that out." (Id.)

Commissioner Fisher echoed these sentiments.  Fisher had initially been keen to

interview Murphy because he was impressed with Murphy's supposed financial background.

(Mahoney Dep. at 38-39, 41.)  However, Fisher learned in the interview that "it was actually

PFM advisors who developed the plan and made it possible for the City [of Wilkes-Barre] to get

funding to help turn around the financial situation." (Fisher Dep. at 73.)  Fisher generally found Murphy to be an "honest" person, at least during his interview.  Fisher summarized: "I believed everything he said to us was truthful. And in his honesty, it revealed the reality that he was not, in my opinion, qualified to be our Township Manager." Id. at 76.  Fisher also testified that the disparity between Murphy's claims in his resume and application papers, and what he said in the interview itself, was a "big issue" in the executive session during which the commissioners voted on which candidates should be granted a second interview. Id. at 97-98.  Granger, who did not have voting power on the Board, nonetheless confirms that the "general consensus" at the executive session was that Murphy had grossly overstated his qualifications, and would not be granted a second interview because of his "over characterization of his work at Wilkes-Barre." (Granger Dep. at 60-62, 80-81).

Thus, four individuals who were present at Murphy's interview have all testified that Murphy's exaggerated application materials dealt a fatal blow to his bid to become Radnor's township manager.  But rather than address the substance of commissioner's concerns, Murphy merely draws on the testimony of Commissioners Hervada and Higgins to support his contention that these concerns weren't all that big a deal.[8]  Murphy neglects to mention, however, that Commissioner Higgins was not present at Murphy's interview.  Conversely, Hervada's testimony that he did not recall any concerns that Murphy had exaggerated his accomplishments is hardly a resounding proof that Murphy didn't exaggerate.  The testimony of neither commissioner is enough to create a genuine issue of material fact.  Rather, the record supports the Defendant's contention that Murphy's application materials, plainly contradicted by

---

[8] Commissioner Hervada testified that he could not recall learning of concerns that Murphy exaggerated his accomplishments. (Hervada Dep. at 119.) Commissioner Higgins, meanwhile, testified that he did not recall Murphy's experience in Wilke-Barre as being a reason why he didn't get a second interview. (Higgins Dep. at 17.)

Murphy's own backtracking during both his interview and deposition, were simply not truthful. In light of this fact, it was perfectly reasonable, legitimate, and arguably imperative for the commissioners to take these exaggerated claims into consideration when deciding not to grant Murphy a second interview.

**<u>Application Materials</u>**

In addition to the general "consensus" that Plaintiff had "exaggerated" his qualifications, there were also other deficiencies in Plaintiff's application materials.  First, Commissioner Masterson noted that Murphy, in answering questions on the application, had cut and pasted from the Wilkes-Barre website, including a section about a particular speech that, as it turns out, the Mayor of Wilkes-Barre had given, not Murphy. (Masterson Dep. at 94-96.)  While Masterson did not think this was necessarily a negative, he did view it as an "example of taking a shortcut." (<u>Id.</u> at 96.)  Second, Murphy's cover letter included typographical errors, which Masterson found to be "sloppy." <u>Id.</u> at 115; Def.'s Ex. K: Murphy's Cover Letter.)  Masterson pointed out the typographical errors in Murphy's submissions to the other commissioners.  Commissioner Fisher, for one, questioned how Murphy could be trusted to "put out communications to 35,000 residents at any given time" if he couldn't proofread his own application. (Fisher Dep. at 99.)

These errors, in and of themselves, likely would not have been enough to preclude Murphy from getting a second interview.  However, when viewed in light of other perceived problems with Murphy's application, these errors were just another factor in the case against Murphy's candidacy.

**<u>Call from Congressman Murphy</u>**

Before Plaintiff Murphy was interviewed by the Board, his brother, now-former

Congressman Patrick Murphy, called Commissioner Masterson on Plaintiff's behalf. (Masterson Dep. at 41.)  It is undisputed that Murphy's brother left a voicemail with Commissioner Masterson, stating, "I'm calling on behalf of my brother's application for township manager with Radnor.  Please call me." Id. at 42.  Masterson did not return this call. Id.  Defendant has argued that the call negatively influenced several Board members, and thereby contributed to the decision not to grant Murphy a second interview.  Conversely, Murphy has disputed any implication that the call had a negative impact on his effort to obtain the job.  In support of this contention, Murphy repeatedly cites Granger's testimony that he was never told that the voicemail was a reason Murphy did not get a second interview. (Granger Dep. at 60.)  In addition, Murphy relies on Commissioner Hervada's testimony that he did not view the voicemail as a negative, and would have been surprised if the Congressman *did not* put in a word for his brother. (Hervada Dep. at 93, 97.)

However, none of this creates a genuine issue of material fact.  Granger did not have voting power on the Board. Hervada, meanwhile, was just one member of a seven member Board. Under Section 2.09 of the Township Charter, a majority of the seven members is required to bind the Board to a particular decision.[9]  Therefore, the mere fact that the Congressman's call did not negatively influence Hervada's personal assessment of whether Murphy should be granted a second interview does not mean that other commissioners could not have been negatively influenced.  Murphy is not in a position to know whether and how great a role the phone call played in the individual voting decisions of the Commissioners in not granting him a

---

[9] Section 2.09(G) provides: "BOARD ACTIONS.  No formal action shall be taken by the Board except at a regular or special meeting with the opportunity provided for comments and questions by the public prior to the vote.  Formal actions by the Board shall be taken only by ordinance, resolutions, or motion….A majority vote of its total membership shall be required for final adoption of all ordinances except as otherwise provided in this Charter…." Proposed Home Rule Charter for Radnor Township, http://www.radnor.com/egov/docs/1304018685_894226.pdf (last visited Oct. 24, 2012).

second interview.  For instance, Masterson has testified that he was so turned off by the

Congressman's call that he deliberately elected not to return the call.[10]  Masterson thought the

call was inappropriate, and testified that the Congressman's call did, in fact, have a bearing on

his own decision not to grant Plaintiff a second interview. (Masterson Dep. at 48, 83.)  Other

commissioners felt the same.  When Commissioner Higgins received word from Commissioner

Masterson that Congressman Murphy had called to lobby for the Plaintiff to receive the position,

Higgins also found this to be a negative, "[b]ecause [he] didn't think an outsider should be

interfering with…Township business." (Higgins Dep. at 17-19).  Higgins further testified, "We

had a discussion around all the candidates and their qualifications, and the fact that his brother

called came up. And the game was over right there for me." (Id. at 29).  Likewise, Commissioner

Mahoney also viewed the call as a negative. (Mahoney Dep. at 57.)  Mahoney, along with other

Commissioners, felt that the call made the hiring process "a little too political" for their liking.

(Id. at 55-56, 103.)

     Moreover, other Commissioners at Murphy's interview were turned off by the fact that

the Congressman was discussed during the interview.[11]  Granger testified that Plaintiff Murphy

implied that Congressman Murphy could help the Township in issues before Congress. (Granger

---

[10] See Masterson Dep. at 42, 45-46 ("I thought it was inappropriate for Congressman Murphy to be calling me about his brother's application for the Township Manager position, and I elected not to return the call…I couldn't see any legitimate reason for a United States Congressman to be calling a Township Commissioner about a family member's application for a job.")

[11] There is a dispute between the parties as to whether Plaintiff Murphy brought up the fact that his brother was the Congressman, or whether he was asked by the Board if he was related to the Congressman.  Compare Granger Dep. at 37-38 (stating Murphy volunteered that his brother was a Congressman) and Fisher Dep. at 117 (recalling that Murphy offered, unsolicited, who his brother was during the interview) with Masterson Dep. at 78 (stating that Murphy was asked about his brother) and Hervada Dep. at 98-99 (stating that he did not recall Murphy "name dropping" his brother).  Drawing all inferences in favor of the Plaintiff, the Court will assume that Murphy was asked about whether he was related to the Congressman, rather than volunteering that information.  Nonetheless, regardless of who initiated the topic, the fact remains that Plaintiff's relation to the Congressman was discussed during the interview.

Dep. at 37-38.)  Similarly, Commissioner Fisher testified that Plaintiff Murphy "talked up" his brother as a connection high up in government. (Fisher Dep. at 132.)  Fisher observed that this raised a question of "character" for both Candidate Murphy and Congressman Murphy. (Fisher Dep. at 121.) Likewise, Commissioner Mahoney testified that Plaintiff implied during his interview that if the Township hired him, "[it] would have a friend with the Congressman," something Mahoney found to be entirely inappropriate. (Mahoney Dep. at 55, 63.)

The phone call from the Congressman must be viewed in light of the discussion of the Congressman during Plaintiff's interview.  Both were viewed as negatives by many of decision makers.  Both, standing alone, were legitimate reasons for not granting Murphy a second interview.  It is entirely reasonable that the commissioners would be wary about the appearance of impropriety of a Congressman exerting influence over Township affairs.  This concern is all the more reasonable when one considers that David Bashore, the previous township manager and the man whom Plaintiff was looking to replace, was forced to resign amid corruption allegations.[12]

Accordingly, the Court finds all four reasons proffered by the Township are sound and well-supported.  Thus, even though Murphy has established that a genuine issue of material fact exists regarding whether his military service was a substantial or motivating factor in the Township's decision, the Township still prevails on its motion for summary judgment because it has adduced sufficient evidence from which no reasonable jury could find that its reasons for not hiring Murphy were invalid.  Any one of the Township's reasons for not granting Murphy a second interview, standing alone, would have been sufficient to justify its decision.  Summary

---

[12] See e.g., Joelle Farrell, Radnor Moves to Oust Township Manager; Commissioners Started the Process to Fire David A. Bashore, who they say Paid Himself $128,500 in Unapproved Bonuses, PHILADELPHIA INQUIRER, Mar. 6, 2009, http://articles.philly.com/2009-03-06/news/25277879_1_bashore-commissioners-bonuses.

judgment is therefore granted in favor of the Defendant with respect to Count I of the Complaint.

### B. Pennsylvania Military Affairs Act (Count II)

The Pennsylvania Military Affairs Act ("PMAA") provides, in relevant part:

> It is unlawful for the Commonwealth or any of its departments, boards, commissions, agencies or any political subdivision … to refuse to hire or employ any individual not on extended active duty because of his membership in the National Guard or any one of the other reserve components of the armed forces of the United States … or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment because of such membership….

51 Pa. Cons. Stat. § 7309.

There are very few reported state or federal cases which have interpreted § 7309. However, as observed in Tukesbrey v. Midwest Transit, Inc., 822 F. Supp. 1192, 1200 (W.D. Pa. 1993), the Pennsylvania legislature has indicated its intent that the provisions of Title 51 be construed "in conformity with all acts and regulations of the United States affecting the same subjects…." 51 Pa. Cons. Stat. Ann. § 103.  Accordingly, the Tukesbrey court found that § 103 required it to apply the same standard to that plaintiff's  PMAA claim as to his claim under the Veteran's Reemployment Rights Act. Tukesbrey, 822 F. Supp. at n. 9.  Similarly, Murphy also appears to assume that the same standard applies to both his USERRA and PMAA claims. (Pl.'s Br. Opp'n Summ. J. 18.)

Thus, the Court finds that the same two-pronged analysis applied to Murphy's USERRA claim also applies to his PMAA claim.  As previously discussed, Radnor Township has presented evidence of numerous legitimate non-discriminatory reasons, other than Plaintiff's military obligations, for the Board of Commissioner's decision not grant Murphy a second interview.  These reasons have been considered at length in this Court's discussion of Plaintiff's USERRA claim, and therefore need not be re-examined here.  Suffice it to say that Murphy's

24

PMAA claim fails for the same reasons as his USERRA claim.  Summary judgment is therefore granted in favor of the Defendant with respect to Count II of the Complaint.

## IV.  CONCLUSION

For the reasons set forth above, this Court finds that the Defendant has shown that "there is no genuine issue as to any material fact and that [it is] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Defendant's motion for summary judgment is granted on all counts.

An appropriate order follows.