**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN J. MURPHY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **RADNOR TOWNSHIP,** | : | **NO. 11-4743** |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OPINION

**Tucker, C. J.**                                                                 **May 21, 2014**

     Plaintiff John J. Murphy ("Plaintiff") filed this civil action against Defendant Radnor Township ("Radnor Township" or "Radnor") for alleged violations of the Uniform Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. § 4301 et seq., and the Pennsylvania Military Affairs Act ("PMAA"), 51 Pa. Cons.Stat. § 7301 et seq. This matter proceeded to trial on February 24, 2014.  After six days of trial, the jury returned a verdict in favor of Radnor Township.  Presently before the Court is Plaintiff's Motion for New Trial.  Upon consideration of Plaintiff's motion, and Radnor's Response in Opposition thereto, Plaintiff's motion will be denied.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

     The facts of this case have previously been fully set forth by the Court.  Murphy v. Radnor Twp., 904 F. Supp. 2d 498, 501-03 (E.D. Pa. 2012).  Plaintiff contends that Radnor Township violated USERRA and the PMAA when it failed to hire him for the position of Township Manager because of his ongoing military service obligations in the United States Air

Force Reserves.  On November 6, 2012, after applying the two-pronged burden shifting analysis applicable to USERRA cases, this Court granted Radnor Township's Motion for Summary Judgment.  In doing so, the Court first found that Plaintiff had met his burden of demonstrating that there was sufficient evidence that his military service obligations were a motivating factor in Radnor's decision not to grant him a second interview and/or hire him for the position of Township Manager.  Id. at 505-07.  However, the Court also found that Radnor Township had met its burden of proving that it had legitimate reasons for not granting Plaintiff a second interview and/or hiring him.[1] Id. at 507-14.

On October 23, 2013, the Third Circuit reversed and remanded.  Murphy v. Radnor Twp., 542 F. App'x 173 (3d Cir. 2013).  The Third Circuit held that under USERRA, an employer has the burden of producing evidence of more than a legitimate, non-discriminatory reason for its employment action. Id. at 178.  Rather, the employer "has the burden of producing a legitimate reason for the adverse employment action that is so overwhelming, 'so compelling,' and 'so meagerly contested' that there is no genuine dispute that the employee would have received the same treatment regardless of his future military obligations." Id. (quoting Madden v. Rolls Royce Corp., 563 F.3d 636, 638 (7th Cir. 2009).  The Third Circuit then found that fact issues existed as to whether Radnor's proffered reasons for not hiring Plaintiff met this standard. Id. at 180.

This matter proceeded to trial on February 24, 2014.  On March 5, 2014, after six days of trial, the jury returned a verdict in favor of Radnor Township.  Specifically, the jury found that Plaintiff had proven by a preponderance of the evidence that his obligation for service in the military was a motivating factor in Radnor Township's decision not to hire him for the position

---

[1] The same two-pronged analysis also applies under the PMAA, and accordingly summary judgment was also granted as to that claim. Murphy, 904 F. Supp. 2d at 515.

of Township Manager.  Verdict Sheet, Mar. 5, 2014, ECF No. 62.  The jury further found that

Radnor Township had proven by a preponderance of the evidence that it would have denied

Plaintiff the position of Township Manager even if Radnor Township had not taken Plaintiff's

obligation for service in the military into account.  Id.  In so deciding, the jury thus found exactly

as this Court had at summary judgment nearly a year and half previously.

Plaintiff now moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a).

## II.  STANDARDS OF REVIEW

Federal Rule of Civil Procedure 59 governs a motion for a new trial.  A court may grant a

new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an

action at law in federal court." Fed.R.Civ.P. 59(a).  A court may grant a new trial on the grounds

of: (1) improper admission or exclusion of evidence; (2) improper instructions to the jury; (3)

newly discovered evidence exists that would likely have altered the outcome of the trial; (4)

improper conduct by an attorney or the court unfairly influenced the verdict; (5) the jury's

verdict is against the clear weight of the evidence; or (6) the verdict is so grossly excessive or

inadequate as to shock the conscience.  See Goodman v. Pennsylvania Tpk. Comm'n, 293 F.3d

655, 676 (3d Cir. 2002) (citing Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir.2000));

Am. Bd. of Internal Med. v. Von Muller, 10-CV-2680, 2012 WL 2740852 (E.D. Pa. July 9,

2012); Suarez v. Mattingly, 212 F. Supp. 2d 350, 352 (D.N.J. 2002); Davis v. Gen. Acc. Ins. Co.

of Am., 153 F. Supp. 598, 599-600 (E.D. Pa. 2001); Griffiths v. Cigna Corp., 857 F.Supp.

399, 410–11 (E.D.Pa.1994), aff'd, 60 F.3d 814 (3d Cir.1995) (unpublished table decision).  The

overriding principle is that a court has the power and duty to order a new trial to prevent

injustice.  11 Charles Alan Wright et al., Federal Practice and Procedure § 2805 (2d ed.1995).

Determining whether to grant a new trial is within the "sound discretion of the trial court." Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980); Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1017 (3d Cir.1995).

The standard that a district court is to apply when ruling on a motion for a new trial differs with the grounds asserted in support of the motion. Lind v. Schenley Industries Inc., 278 F.2d 79, 89 (3d Cir.1960). The district court has broad discretion when the asserted ground for a new trial is a ruling on a matter that initially rested within the discretion of the court, such as an evidentiary ruling or jury instruction. Klein v. Hollings, 992 F.2d 1285, 1289–90 (3d Cir.1993); Lind, 278 F.2d at 90; Farra v. Stanley–Bostitch, Inc., 838 F.Supp. 1020, 1026 (E.D.Pa.1993). Where the motion for a new trial is based on an assertion of legal error, the court conducts a two-step analysis.  First, the court determines whether it erred at trial.  Second, the court determines "whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.'" Farra, 838 F.Supp. at 1026 (quoting Bhaya v. Westinghouse Elec. Corp., 709 F.Supp. 600, 601 (E.D.Pa.1989) (quoting Fed.R.Civ.P. 61)).

### III.  DISCUSSION

Plaintiff asserts the Court committed two errors which warrant a new trial.  First, Plaintiff contends the Court erred in permitting the testimony of the three candidates for the position of Township Manager who were offered the position in 2009 but ultimately turned down the offer. Second, Plaintiff claims the Court erred in not giving the jury Plaintiff's proposed "cat's paw" jury instruction.  The Court will examine each of Plaintiff's arguments in turn.

4

**A.  The Court Did Not Err in Permitting the Testimony Miller, Kraynik, and Canavan**

Plaintiff first contends the Court erred in permitting the testimony of Peter Miler, David Kraynik, and Christopher Canavan — the three candidates who were offered the position of Township Manager, but ultimately turned down the offer.  Plaintiff claims the testimony of these three candidates "was irrelevant in that the only relevant evidence would be how the candidates presented themselves at their interviews in 2009 and not how they presented themselves in court in 2014, and how they answered the specific questions presented to them in 2009 and not how they testified in court in 2014." (Pl.'s Mot. New Trial ¶1.)

Plaintiff's logic is both deeply flawed and unusually narrow.  In any hiring process, how a candidate presents during an interview is not the only relevant consideration.  A candidate's qualifications, among other things, determine whether the candidate is granted an initial interview; a candidate's qualifications, coupled with their performance during that initial interview, determine whether a candidate progresses further in the hiring process.  As Radnor argues now and argued at trial, it is Plaintiff who has repeatedly put his qualifications at issue. Plaintiff's entire case is built on his insistence that he was as qualified or more qualified than the other candidates who interviewed for this position, and thus he should have been both offered a second interview and offered the position.  Accordingly, Plaintiff has repeatedly avowed that but-for Radnor's board members being improperly motivated by his military service obligation, he would have been offered the position of Township Manager.  Plaintiff repeatedly averred in his complaint: "The Plaintiff was as qualified or more qualified for the position of Township Manager than the three remaining applicants which were granted interviews." (Compl. ¶ 32); "The Plaintiff was as qualified or more qualified for the position of Township Manager than the

candidate who was selected." (Id. ¶ 33); "The Defendant did not hire Plaintiff for the position of Township Manager because of his military and/or reserve obligations, including active duty and/or training requirements resulting in his past and likely future absences from work on account of such duty. (Id. ¶ 34.)

Likewise, as has previously been discussed, Plaintiff has taken particular issue with the fact that Mr. Canavan was offered the position. Murphy, 904 F. Supp. 2d at 509-10.  For this reason, Plaintiff has continually argued that it was exceptionally egregious that Canavan — an individual whom Plaintiff deems to have been far less qualified than himself — was offered a second interview and the position.  Thus at summary judgment, Plaintiff asserted:

> Mr. Murphy had far more relevant and recent experience than Canavan, serving as administrator for the [C]ity of Wilkes Barre since 2004 and Deputy Administrator for two years prior to that.  Mr. Murphy also had impressive military experience which no other candidate who received a second interview or was offered the position had.

(Resp. Opp'n Mot. Summ. J. 14); see also id. ("[I]f Mr. Murphy was offered second interview at the same time as Miller and Kraynik, at some point he would have been offered the job.  If he was revisited for a second interview, as was the significantly less qualified Canavan, he would have been offered the job.")  These same arguments were again presented at trial.  For instance, although opening statements are not evidence, see Model Civ. Jury Instr. 3rd Cir. 1.12 (2011); Trial Tr. 10:9-14, Feb. 25, 2014, the arguments presented by Plaintiff's counsel during opening statements are illustrative of how Plaintiff again emphasized he was more qualified than any of the other candidates:

- "The first interviews…are all over with and they bring back a man for the second interview named Miller.  And of course, Miller was not…in the reserves, he does not have any future military obligations, and they offer him the job, right around the same time that Mr. Murphy's attorney is trying to get

6

him the second interview.  **They offer him the job.  And his qualifications are no better than Mr. Murphy's…. And there is nothing in Miller's resume that compares to the military service Mr. Murphy had to restore that trust [in the Township Manager] immediately**." (Trial Tr. 29:15-30:6, Feb. 25, 2014) (emphasis added).

- "A man named Kraynik gets the next second interview which equals[2] a job offer.  Comes in, has dinner, has the family around, everybody is talking, everything is fine, goes there, second interview equals job offer.  Gets the job offer.  Kraynik rejects it.  **Now, if Mr. Murphy got his second interview in this time frame right which they asked for it, second interview equals job offer. He would have the job. Okay. Now, instead of doing that, instead of giving Mr. Murphy a shot, they go back to a man who was initially rejected for a second interview a month or two before, a man named Canavan.  Not good enough got a second interview.** He has got some

---

[2]    The fact that Plaintiff seeks to equate getting a second interview with being offered the position is another logical fallacy, one which has been a running theme of Plaintiff's case. (See Resp. Opp'n Mot. Summ. J. 13) ("Mr. Murphy's military service was clearly a motivating factor in him not proceeding in the interview process.  **If Mr. Murphy proceeded to the second interview, it may be reasonable inferred that he would have been offered the position of [T]ownship [M]anager. It is critical to note that every person who was given a second interview by the Defendant was ultimately offered the job.**") (emphasis added); (Trial Tr. 30:10-16, Feb. 25, 2014) ("[T]hese [second interviews] are social interviews, these second interviews aren't in-depth questioning, these will be described as social things, the people come into town with their families, almost like they interview us to see if they have any questions.  **Pretty much if you get the second interview, the second interview equals job offer.**") (emphasis added); (id. at 33:2-11) ("I gave you the process.  Now, after Miller rejected the job, if Mr. Murphy was in the class with…Miller and Kraynik and they all three got interviews, by them rejected the jobs he would have gotten the job at that time.  That's why he was asking for the second interview.  **If he was interviewed at around the time…they went back and got Canavan, he would have gotten the second interview, would have gotten the job.**") (emphasis added); (id. at 34:3-7) ("But remember, Mr. Zienkowski would not have even gotten anywhere near that job **if they had interviewed Mr. Murphy earlier and given the second interview, which as the process went, second interview equals job.**") (emphasis added).

        Plaintiff entirely ignores the fact that only the most qualified candidates were granted second interviews.  In asserting that he should have been given a second interview, Plaintiff again presupposes he was among the most qualified candidates.  In reality, as *every* candidate who was offered a second interview and *every* Radnor commissioner testified, the second interviews were *not* merely social interviews or a mere formality.  In any employment situation, it sometimes happens that an employer has difficulty filling an open position, and that the individual who ultimately accepts a position may not have been the first person to whom that position was offered.  In this case, for different reasons, Miller, Kraynik, and Canavan all turned down the Township Manager position.  (See Trial Tr. 13:22-15:6, Feb. 27, 2014) (Kraynik testifying he did not accept the position because Radnor wanted to pass a resolution regarding the terms of his employment, rather than having a written employment agreement); (id. at 42:22-45:5) (Miller testifying he did not accept the position because the proffered salary was insufficient — especially when considering the increased housing costs in Radnor Township relative to Egg Harbor Township); (id. at 98:25-100:16) (Canavan testifying that he initially accepted the position with Radnor Township, but that his current employer then offered to significantly increase his salary and give him additional job responsibilities if he were to stay, and so Canavan opted to stay with his current employer because that was more beneficial for his family).  Thus, despite Plaintiff's insistence to the contrary, there is no factual support for the notion that if a candidate got a second interview then it was a foregone conclusion that they were going to get a job offer.

friends that recommend him again, since [Radnor's] process is going south, nobody taking the job, so they give Canavan a second interview." (<u>Id.</u> at 30:24-31:15) (emphasis added).

- "**Now, Canavan is a very important guy in this case because if there is any dispute about qualifications, there will be no dispute in your minds that Canavan's qualifications were anywhere near Mr. Murphy's.**   Mr. Murphy was a manager at the time in Wilkes-Barre.  He was the manager for the last five years, assistant manager, a deputy manager in Wilkes-Barre for two years before that, assistant to the mayor before that, interned.  Canavan had not been a township manager for six years before the interview process.  He worked in private industry for a land developer.  No municipal service in six years, going back to July of 2003.  Now we are in August, September, 2009, okay.  And when I tell you this, this is why he did not make their cut in the first place….Yet, just like all the other ones, second interview equals job offer. They offered him the job. And what do you think happened?  He rejects it.  In the meantime, his employer, a private employer, offered him some more money so he stayed with him.  **That's how dedicated he was to being a public servant, but he still got a job offer and rejects it.  They still didn't call Mr. Murphy back for second interview.**" (<u>Id.</u> at 31:16-33:1) (emphasis added).

- "**A guy like Canavan, him alone, his qualifications alone are so far below Mr. Murphy's that that reason is plainly false. And you will see — and wait until you hear they try to say how good Canavan is.**  One thing they are not going to say is that [Canavan] was a township manager for the last six years before the interview.  One thing they won't say is that since the time of his second interview he gained some kind of experience that just changed the whole tide and now we want him as the manager, they won't tell you that." (<u>Id.</u> at 35:5-16) (emphasis added).

Subsequently, on direct examination, Plaintiff gave extensive testimony regarding his personal life, his military service background, the content of his military service, and his experience in municipal government.  Later, during cross-examination, Plaintiff himself testified he was more qualified that these other candidates.  Specifically, Plaintiff stated:

Q. Right.  And now subsequent to [this] lawsuit you were given information about the other candidates who got the job offers and were offered the job, right?

A. Yes.

8

Q. **And after you reviewed that information, did that change your mind as to whether or not they were better qualified or as qualified as you?**

A. **It did not change my mind.**

Q. And what impression did you have?

A. I certainly had much more experience than some of the candidates in leadership roles or municipal management, leading hundreds of people, the size of Radnor.   There's [sic] some applicants who never supervised more than 50 people.   I mean, when you are talking about vast municipal operations…it's different than running a community with 25 people.

Q. **And that would be Canavan, right?**

A. **That would have been.**

(Trial Tr. 63:25-64:22, Feb. 26, 2014) (emphasis added).  Thus, Plaintiff himself clearly echoed the allegations made by his counsel in his pleading, the arguments his counsel made in opposing summary judgment, and the arguments his counsel made during opening statements.

Plaintiff only objected to the testimony of Miller, Kraynik, and Canavan after he himself had made all of the foregoing arguments, had presented all of his witnesses (himself, Commissioner Hervada, Interim Township Manager John Granger, Commissioner Spingler, and current Township Manager Robert Zienkowski), and had rested his case in chief. (Trial Tr. 2:4-6:23, Feb. 27, 2014.)  Having presented all of his evidence, Plaintiff plainly sought to prevent Radnor from mounting its defense.  The arguments Plaintiff raises now are the same arguments Plaintiff raised in making his objection at trial and which the Court considered and rejected.  As the Court ruled at trial, it would have been improper to permit Plaintiff to testify at some length and in great detail about himself and his qualifications but deny Radnor Township the opportunity to do the same for the three candidates who were offered the position but turned it down. (Id. at 6:7-20.)  The qualifications of Miller, Kraynik, and Canavan — *i.e.*, the reasons

9

they, but not Plaintiff, were offered second interviews and ultimately the position — are directly relevant to whether Radnor Township would have denied Plaintiff the position of Township Manager even if it had not taken Plaintiff's military service obligation into account.  In other words, the qualifications of these individuals are directly relevant to Radnor's affirmative defense and thus whether it had met its burden under USERRA's two-pronged burden shifting scheme,  In sum, the testimony of these individuals is relevant for at least two reasons: (1) it is a relevant to counter the repeated assertions of Plaintiff and his counsel that Plaintiff was as qualified or the most qualified person for the position, and (2) it is relevant to Radnor's affirmative defense and whether it had met is burden of proving by a preponderance of the evidence that it would have denied Plaintiff the position of Township Manager even if Radnor Township had not taken Plaintiff's obligation for service in the military into account.

Plaintiff's remaining arguments to the contrary are meritless.  Plaintiff contends that Miller, Kraynik, and Canavan should not have been permitted to testify because:

> [They] were obviously prepared for trial by the defense, knowing the exact questions that were going to be asked of them.  It was also the Defendant's goal to present the candidates in the best light possible.  This is quite different than the way they were likely questioned at interview in 2009 when they were on their own to answer questions which they may not have expected.  Thus, the witnesses' presentation in 2014 cannot be argued to mimic their presentation in 2009, which presentation is the only relevant information regarding comparing their qualifications to that of Mr. Murphy.

(Pl.'s Mem. Supp. Mot. New Trial. 9-10.) Thus, it is essentially Plaintiff's argument that Miller, Kraynik, and Canavan should not have been permitted to testify because they were good witnesses.  Setting aside the fact that the extent of Miller, Kraynik, and Canavan's trial preparation is nothing but pure speculation by Plaintiff,[3] and setting aside the fact that Plaintiff

---

[3] If Plaintiff's counsel believed that Miller, Kraynik, and Canavan's testimony was "coached," that was something

presents no legal authority for the proposition that this argument is reasonable grounds for precluding a witness' testimony, the question is not even whether the trial setting of 2014 "mimics" the interview process of 2009.  In *any* case, the length and nature of the litigation process almost inherently means that the parties are not exactly as they were back during the events in question.  Litigation is not intended to "mimic" or "duplicate" past events. (See id. at 8.)  The question is whether their testimony was relevant to the facts at issue in this matter.  The Court has already outlined the reasons why their testimony was relevant.  The fact that Plaintiff is annoyed by the fact that these individuals testified well is not a reason to preclude their testimony in its entirety.

Additionally, Plaintiff claims he was prejudiced because Miller, Kraynik, and Canavan "were further allowed to testify as to their work experience to the date of trial, which information could not have been considered by the Defendant in their 2009 job offers." (Id. at 8.)  Plaintiff greatly overstates the extent to which these individuals testified to their work experience since 2009.  The vast majority of each of their respective testimonies regarded their qualifications up until 2009.  Post-2009, the work experience of these candidates is substantially the same.  At the time of his interview in 2009, Miller was the Manager of Egg Harbor Township in New Jersey.  At the time of trial in 2014, Miller was *still* the Manager of Egg Harbor Township.  At the time of his interview in 2009, Kraynik was the Township Manager of Cheltenham Township.  At the time of trial in 2014, Kraynik was the Township Manager in Upper Merion Township.  At the time of his interview in 2009, Miller was working for a builder in the private sector.  At the time of trial in 2014, Miler was *still* working for the same builder in the private sector.  Such negligible testimony is hardly grounds for upsetting the jury's verdict.

---

for Plaintiff's counsel to bring out during cross-examination.  It is not a reason for barring their testimony.

**B.  The Court Did Not Err in Not Giving the Jury Plaintiff's Proposed "Cat's Paw" Jury Instruction**

Plaintiff next argues the Court erred in not giving the jury its requested cat's paw instruction.  Plaintiff's proposed cat's paw instruction was based on the United States Supreme Court's ruling in Staub v. Proctor Hosp., 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011).

In Staub, the plaintiff alleged that, in violation of USERRA, he was terminated from his employment with the defendant because of his supervisors' hostility toward his obligations in the military reserve.  Id. at 1189.  The plaintiff submitted evidence (in the form of his own testimony and that of his co-workers) of frequent remarks by the supervisors expressing hostility to his military service and the supervisors' desire to get rid of him. Id. The supervisors issued an unwarranted corrective action against the plaintiff and then lied to management, informing them that the plaintiff had violated the terms of the corrective action. Id. In reliance on his supervisors' statements, the defendant employer's vice president of human resources terminated plaintiff's employment. Id.  In filing suit against his former employer, Staub did not argue that the vice president of human resources had any hostility towards him; rather, he argued that his supervisors exhibited discriminatory animus and that their actions influenced the vice president of human resources' ultimate employment decision. Id. at 1191.

The Supreme Court held that "if a supervisor performs an act motivated by anti-military animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the USERRA." Id. at 1194 (emphasis). The Staub Court found that there was evidence that the plaintiff's supervisors' actions were motivated by hostility towards the plaintiff's military obligations, and there was also evidence that the plaintiff's supervisors' actions were causal

factors underlying the vice president of human resources' decision to fire the plaintiff. Id. at

1194.  Accordingly, the Supreme Court reversed the decision of the Seventh Circuit granting the

employer judgment as a matter of law, and remanded.

> In the instant matter, near the close of trial Plaintiff proposed the following instruction:

> If a participant in the decision-making process performs act motivated by antimilitary animus that is intended by that participant to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under Uniformed Services Employment and Reemployment Rights Act (USERRA), notwithstanding that the participant did not make ultimate employment decision.

> *Staub v. Proctor Hospital,* 131 S. Ct. 1186 (2011)

Proposed Jury Instruction, Feb. 27, 2014, ECF Nos. 69 & 70.  The Court heard argument[4] on this

proposed instruction, and decided this was not a case in which the cat's paw instruction was

applicable. (Trial Tr. 85:15-16, Feb. 28, 2014.)  The arguments in favor of the instruction that

Plaintiff raises in the instant motion, see Pl.'s Mem. Supp. Mot. New Trial. 10-14, are no

different from the arguments the Court considered and rejected at trial.

---

[4] Plaintiff's counsel made the following argument in favor of the cat's paw instruction.

> Mr. Borland: ….Under cat's paw doctrine and under Staub v. Proctor Hospital from the Supreme Court, if one individual that was in the decision making chain was in fact piling on or giving information to influence the other individuals based on his antimilitary animus, then the jury can also find for the plaintiff. It does not necessarily have to be the majority of people on the counsel said because of military animus, I won't vote for Mr. Murphy.  But if one individual on the council piled on or gave additional information that he did not give of other candidates to the council with the intent to disqualify Mr. Murphy, that's enough as well.
> 
> Well, in this case, the examples would be Mr. Masterson checking the spelling on one specific candidate and not on other candidates, and Mr. Masterson waiting until after the interview to instruct the rest of council that he received a call from Patrick Murphy.  All of this can be seen as things trying to influence based on the antimilitary animus, especially when you combine that with the fact that Ms. Masterson, based on testimony, was the one who did the majority of the questioning on Mr. Murphy's ongoing military obligation.

(Trial Tr. 83:18-84:22, Feb. 28, 2014.)

Nowhere in the <u>Staub</u> opinion does the Supreme Court state that the cat's paw theory of liability is applicable in every USERRA case.  This Court found that cat's paw theory is improper on the facts of this case, and therefore the instruction was improper.  First, <u>Staub</u> explicitly concerned a situation where the decision maker (the vice president of human resources) was not alleged to have anti-military animus; rather, it was the plaintiff's supervisors who were alleged to have anti-military animus, and who acted to improperly cause the plaintiff to suffer an adverse employment action.  The vice president of human resources was the "cat's paw" — acting to do that which the plaintiff's supervisors could not themselves do.  Here, this is not a situation where "a *supervisor* performs an act motivated by anti-military animus that is intended by the supervisor to cause an adverse employment action." <u>Staub</u>, 131 S. Ct. at 1194 (emphasis added).  There are no supervisors or subordinates on Radnor's Board of Commissioners, and there is no single decision maker.  Each commissioner is equal to all the other commissioners, and each exercised his independent judgment regarding which candidates he thought should receive a second interview.  Each of the commissioners testified at trial as to the Board's process for choosing which candidates were granted second interviews.  Not a single commissioner who was at Plaintiff's interview believed that he should have received a second interview, much less the position.  Plaintiff does not cite, and did not cite at trial, a single case in which the cat's paw theory was applied in a context where there are many decision makers with equal decision making authority, and it cannot be said that any of these decision makers were improperly influenced by an employee who did not have decision making authority.  <u>Staub</u> is thus factually distinguishable and the cat's paw instruction was inappropriate on the facts of this case.[5]

_____

[5] Plaintiff also misrepresents both the timing of the proposed instruction, and the context in which it was proposed.

Further, even if the cat's paw instruction was proper, the Court's refusal to include it was harmless error.  The Supreme Court explicitly stated in <u>Staub</u> that that case concerned defining what is a "motivating factor" in an employment decision. <u>Staub</u>, 131 S. Ct. at 1191 ("*The central difficulty in this case is construing the phrase 'motivating factor in the employer's action.'* When the company official who makes the decision to take an adverse employment action is personally acting out of hostility to the employee's membership in or obligation to a uniformed service, a motivating factor obviously exists. The problem we confront arises when that official has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else.") (emphasis added).  Plaintiff acknowledged as much in advocating for inclusion of the instruction. (<u>See</u> Trial Tr. 83:18-84:4, Feb. 28, 2014) ("*As far as what's a motivating factor or what it takes*, we referred though[out] the case about a majority of council needed to demonstrate…that the majority of council was influenced by Mr. Murphy's ongoing military obligations.  Under cat's paw doctrine and under Staub v.Proctor Hospital from the Supreme Court, if one individual that was in the decision making chain was in fact piling on or giving information to influence the other individuals based on his antimilitary animus, then the jury can also find for the plaintiff.") (emphasis added).  The language of Plaintiff's proposed instruction also recognizes as much. <u>See</u> <u>Proposed Jury Instruction</u>, Feb. 27, 2014, ECF No. 70 ("If a participant in the decision-making process performs act *motivated by* antimilitary

---

In his motion, Plaintiff claims he "requested the cat's paw instruction **based on another instruction given by the court** entitled 'Binding Decisions.'" (Pl.'s Mem. Supp. Mot. New Trial 12) (emphasis added).  Plaintiff also now claims the cat's paw instruction was intended to "clarify" the Binding Decisions instruction. (<u>Id.</u>)  Both claims are factually incorrect. At the time Plaintiff proposed this instruction, and arguments were held on *all* of the parties' competing proposed instructions, the Court had not yet drafted its jury instructions.  Accordingly, no instructions had even been seen by the parties, much less "given by" the Court to the jury.  Further, as will be discussed, **Plaintiff did not propose the cat's paw instruction to "clarify" the Binding Decisions instruction** (which was proposed by Radnor, and ultimately adopted by the Court).  **Plaintiff explicitly proposed the cat's paw instruction to clarify the meaning of "motivating factor," not as an alternative to or clarification of the Binding Decisions instruction.**

15

animus….")  Thus, cat's paw theory is only relevant to the first question on the verdict sheet —
*i.e.*, whether Plaintiff had met his burden of "prov[ing] by a preponderance of the evidence that
his obligation for service in the military was a *motivating factor* in Radnor Township's decision
not to hire him for the position of Township Manager." Verdict Sheet, Mar. 5, 2014, ECF No. 62
(emphasis added).  The jury answered this question in the affirmative, and therefore Plaintiff
prevailed on this question.  The second question, which is the entire basis of Plaintiff's Motion
for New Trial, does not concern what is a motivating factor.  See Proposed Order, Mar. 5, 2014,
ECF No. 67-2 (stating that Plaintiff is seeking a new trial "only on the issue of whether the
Defendant, Radnor Township[,] would have denied Mr. Murphy the position of Township
Manager even if Radnor Township had not taken Mr. Murphy's obligation for service in the
military into account"); (see also Pl.'s Mem. Supp. Mot. New Trial. 1.)  Plaintiff therefore was
not prejudiced by the Court's refusal to include the instruction.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for New Trial is denied.  An
appropriate order follows.

16